A jury found appellant Brandon Davis guilty of murder and two firearm specifications. The trial court convicted Davis and sentenced him to an indefinite term of 15 years to life for the murder and to three years' incarceration on the first specification. The specification sentence was to be served consecutively to the sentence imposed for murder.
Davis raises two assignments of error. He asserts first that the trial court wrongly imposed a three-year sentence, as opposed to a one-year sentence, on the gun specification. In his second assignment, he claims his conviction was against the manifest weight of the evidence because the state's witnesses were not credible.
Maceo Powell and Arvie Jenkins decided to attend the Kool Jazz Festival activities in downtown Cincinnati. Powell drove his father's pickup truck. While the traffic was gridlocked, Powell decided to exit from the driver's side of the truck to speak with some young women in the car in front of the truck. When he got to the taillight of the car, at least two unidentified people attacked him. An assailant placed one arm around Powell's neck and covered Powell's eyes with his left forearm. Powell felt under his chin a cold piece of metal that he assumed was a gun. He closed his eyes and slumped to the ground "in shock." Someone ripped a gold chain from his neck. While his eyes were closed, he heard one "boom," which he described as loud enough to be a gunshot. He opened his eyes and saw people running from the area. He then left the area himself.
He returned shortly, remembering that he had abandoned his father's truck in the middle of the street. When he got back in the truck, he noticed Jenkins was gone. Believing that Jenkins was probably nearby, Powell moved the truck, while keeping an eye out for Jenkins. Powell then saw Jenkins, who had been shot in the heart, lying in an ambulance. Jenkins later died at a hospital.
Two witnesses positively identified Brandon Davis as firing the fatal shot. One witness testified that she had seen some men kicking another man on the ground. She and some friends were videotaping the festivities. She then noticed a young black male standing on the sidewalk, less than a car length behind her. Because he was standing only two or three feet away from the men kicking the man on the ground, she believed that he was a part of that group. Although she viewed the young man only from the side, she had no problem seeing him, because the area was sufficiently illuminated by streetlights and car lights. She later identified him as Brandon Davis. She watched as Davis pulled a small black handgun from the waist of his shorts, took aim, and fired one shot. She testified that the crowd did not jostle Davis's arm.
The next day, she saw a news report about the incident and contacted the Cincinnati police. She provided them with her videotape and a description of the gunman, and helped in the preparation of a composite drawing of Davis. A couple of weeks later, she viewed a lineup in which she positively and unhesitatingly identified Davis as the gunman. She also identified him in court.
Another witness, who had been standing on the sidewalk, observed what he described as a "tussle" involving ten or twenty people beating up one person. He was located ten to fifteen feet to the left of the fight, and Davis was standing nearby on the right. The witness knew Davis from the streets as "Gambino." The witness saw Jenkins run toward the fight. He saw Davis stretch his arm in the direction of Jenkins. Davis was holding a black gun. The witness heard at least one shot and saw Jenkins grab himself and fall to the ground.
The police picked up the second witness and took him to the station for questioning because he appeared in the videotape and was a possible suspect. They informed him that they had information that he was the gunman. Initially, the witness informed the police that he had heard a shot, and that although he did not know who was involved, he had heard "Gambino" was the shooter. He refused to tell what he had observed because he was afraid there would be retaliation. He spoke with the police a second time, after Davis had been arrested, and told them what he testified to at trial — that Davis was the shooter.
Davis testified that he was on the street, but not near the fight, talking to a young woman from North Carolina named Michelle. He heard a gunshot and pulled out his ".380 automatic." He and others around him started running. His weapon discharged when someone pushed him from behind as he was pulling it out of his waistband.
Davis claimed that when he heard news reports the next day, he thought he might have shot someone. He also heard later that the police wanted to question him about the incident. He made no effort to contact the police. Two months later, he was arrested. During his interrogation, he told three different stories. He first claimed that he was not present and had nothing to do with the incident. He next claimed he saw someone else fire a gun. His final story was the testimony he provided at trial: that his gun accidentally fired. He denied shooting Jenkins or wanting to shoot Jenkins.
In his first assignment, Davis claims that the trial court should have sentenced him to one year of incarceration for the first gun specification. The first specification charged Davis with having on his person or under his control a firearm when he committed the offense of murder. This specification carried a mandatory one-year sentence. The second specification charged him with having on his person or under his control a firearm while committing the offense of murder, and with displaying, brandishing, indicating his possession of, or using the firearm to facilitate the offense of murder. This specification carried a mandatory three-year sentence. A trial court may impose only one prison term for multiple gun specifications.[1]
The record demonstrates that the trial court sentenced Davis on the first specification, stated that it could not sentence him on the second specification because it was "an allied offense," and then imposed a three-year sentence. But the first specification only allowed a one-year sentence. Thus, the sentence was not legally proper. But it was probably a mistake (which could have easily been avoided had all parties reviewed the entry), because the judge probably meant to sentence on the second specification. We must remand this case for the trial court to correctly sentence Davis either to one year on the first gun specification, or to three years on the second gun specification.
In his second assignment, Davis contends that his conviction for murder was against the manifest weight of the evidence, attacking the credibility of the two eyewitnesses. But he requests this court to discharge him. Based on Davis's assignment and his argument, we treat his claim as one challenging the weight of the evidence. Of course, were we to hold that his conviction is against the manifest weight of the evidence, Davis would not be entitled to a discharge, but only to a new trial.[2]
In assessing the weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving the conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice.[3] Of course, the jury is generally free to believe all, part, or none of the testimony of each witness.[4]
While we recognize that the record before us does raise questions of credibility, it fails to disclose that the jury lost its way. Accordingly, we affirm that part of the trial court's judgment reflecting the verdicts of guilt and imposing a sentence for murder, but we vacate the sentence separately imposed for the firearm specification and remand this case for resentencing on the specification appropriately chosen by the trial court.
And the Court, believing that there were reasonable grounds for this appeal, allows no penalty. Costs shall be taxed in compliance with App.R. 24,. A copy of this Memorandum Decision and Judgment Entry shall constitute the mandate, which shall be sent to the trial court for execution pursuant to App.R. 27.
Judgment accordingly.
HILDEBRANDT, P.J., and SHANNON, J., concur.
RAYMOND E. SHANNON, retired, of the First Appellate District, sitting by assignment.
To the Clerk:
Enter upon the Journal of the Court on February 26, 1999 per order of the Court ____________________. Presiding Judge
[1] See R.C. 2941.145 and 2941.141.
[2] See State v. Thompkins (1997), 78 Ohio St.3d 380, 388,678 N.E.2d 541, 547.
[3] State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720.
[4] See State v. Antill (1964), 176 Ohio St. 61, 197 N.E.2d 548;State v. Harriston (1989), 63 Ohio App.3d 58, 577 N.E.2d 1144.